**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**SHERMAN LYNELL THOMAS,**

     **Plaintiff,**

**vs.**                          **Case No. 4:09cv1-SPM/WCS**

**I.B.E.W.,**

     **Defendant.**

_____/


## SECOND REPORT AND RECOMMENDATION[1]

Plaintiff initiated this action on January 2, 2009. Doc. 1. Pending is the second amended complaint filed on April 6, 2009. Doc. 12.

After service, claims against Defendants Joseph L. Adams and Thomas L. Johnson were dismissed, docs. 39 and 41, and this case proceeds only against International Brotherhood of Electrical Workers (I.B.E.W., hereafter the Union). Plaintiff was a member of the Union when he worked for Progress Energy.

At the conclusion of the discovery period, *see* docs. 42 and 47, Defendant filed a motion for summary judgment. Doc. 51. Plaintiff, who is *pro se*, was advised of his obligation to respond, doc. 54, and his response was filed on September 16, 2010. Docs. 62, 63.

_____

[1] The court should note that a report and recommendation has been entered today in a related case, case number 4:09cv433-RH/WCS.

**Allegations of the Second Amended Complaint, Doc. 12.**

Plaintiff brought his complaint pursuant to Title VII alleging discrimination (race and color) by the Union and retaliation for filing EEOC charges. Doc. 12, p. 3. Plaintiff also appears to bring a statutory claim that the Union breached its duty of fair representation by terminating arbitration and failing in its duty to represent Plaintiff. *Id*.

**Motion for summary judgment**

Defendant moves for summary judgment, arguing that Plaintiff was not a victim of discrimination, but was fairly represented by the Union and that representation resulted in a $250,000.00 offer to Plaintiff, which he rejected. Doc. 51-1. Defendant contends that Plaintiff's failure to take responsibility for his actions led to his termination, but the Defendant provided Plaintiff with competent and reasonable representation. Doc. 51-1, pp. 17-19.

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment Defendant initially has the burden to demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986). If accomplished, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial. *Id*. An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted). Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of

evidence is insufficient.  The court must decide "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law." Hickson Corp., 357 F.3d at 1260, *quoting*

Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202

(1986).  All reasonable inferences must be resolved in the light most favorable to the

nonmoving party, Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999), if

there is a genuine dispute as to those facts.  Scott v. Harris, 550 U.S. 372, 380, 127

S.Ct. 1769, 167 L.Ed.2d 686 (2007), *cited in* Ricci v. DeStefano, 129 S.Ct. 2658, 2677

(2009).  "Where the record taken as a whole could not lead a rational trier of fact to find

for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Industrial

Co., 475 U.S. at 587 (internal quotation marks omitted), *quoted in* Ricci v. DeStefano,

129 S.Ct. at 2677.

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by

her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v.

Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting*

Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The

nonmoving party need not produce evidence in a form that would be admissible as Rule

56(e) permits opposition to a summary judgment motion by any of the kinds of

evidentiary materials listed in Rule 56(c).  Owen v. Wille, 117 F.3d at 1236; Celotex, 477

U.S. at 324, 106 S. Ct. at 2553.

Local Rule 56.1(A) provides that a motion for summary judgment "shall be

accompanied by a separate, short and concise statement of the material facts as to

which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement constitutes grounds for denial of the motion." The Local Rule also provides that the statement "shall reference the appropriate deposition, affidavit, interrogatory, admission, or other source of the relied upon material fact, by page, paragraph, number, or other detail sufficient to permit the court to readily locate and check the source." Defendant filed a statement of uncontested material facts, pointing to evidence in the record for support. Doc. 51-2.

The Local Rule provides that the party opposing the motion shall serve a similar statement of material facts as to which the party contends there is a genuine issue to be tried, using the same format. Facts set forth in Defendants' statement will be deemed admitted (if supported by the record evidence) unless controverted by Plaintiff's statement. While Plaintiff has filed his statement of material facts, doc. 63, it contains no references at all to any source for the statements and assertions made. The statement does not comply with Rule 56.1(A).

**The undisputed Rule 56 evidence[2]**

Plaintiff began his employment with Progress Energy on March 23, 1987, and joined the Union at approximately the same time. Doc. 51-2, p. 1; Enyard affidavit, ¶ 2.[3] During the course of the next seven years, Plaintiff "filed more than two dozen grievances." Doc. 51-2, p. 1; Enyard affidavit, ¶ 3. Each grievance was "investigated by the Union and taken through the various steps of the process until resolved." *Id.*

---

[2] Plaintiff has provided a number of attachments to his opposition to summary judgment. Doc. 62-1. None of those are explained in the statement of facts, and only briefly pointed to in the memorandum of law. Doc. 62, pp. 3-5.

[3] Butch Enyard's affidavit is on the electronic docket as doc. 51-3, pp. 27-30.

Plaintiff prevailed in some of his grievance, some were not resolved in his favor, and others were "simply discontinued by the Union."  Doc. 51-2, p. 1; Enyard affidavit, ¶ 4. Throughout that period of time, Plaintiff never complained that the Union treated or represented him unfairly.  Doc. 51-2, p. 2; Enyard affidavit, ¶ 4.

In March of 1994, Plaintiff was terminated from his employment for violation of the company's meal policy[4].  Doc. 51-2, p. 2; Enyard affidavit, ¶ 5.  A lengthy arbitration process ensued and Plaintiff was "represented by counsel provided by the union."  *Id.* Arbitration resulted in an award being "entered in favor of [Plaintiff] and the Union" and Plaintiff was returned to his employment.  Doc. 51-2, p. 2; Enyard affidavit, ¶¶ 5-6.  The arbitrator stated the award "was based solely on the employer's failure to notify [Plaintiff] that violation of the meal policy would result in termination."  Doc. 51-2, p. 2; Enyard affidavit, ¶ 6; Exhibit A, of Enyard's affidavit p. 13.[5]  The arbitrator found Plaintiff's "interpretation of the meal clause could not be deemed reasonable by any fair-minded observer," and that Plaintiff was "on notice of the Company's interpretation of the meal clause."  Doc. 51-2, p. 2; Exhibit A of Enyard's affidavit, p. 13.  The arbitrator also found Plaintiff's testimony to contain "numerous inconsistencies, discrepancies and [have] inherent unbelievability."  Doc. 51-2, p. 2; Enyard affidavit, ¶ 7; Exhibit A, p. 13.  Plaintiff was reinstated to employment, but "without back pay or other benefits, including accrual of seniority," and placed on twelve-months probation.  Doc. 51-2, p. 2; Enyard affidavit,

---

[4]  Plaintiff provided an attachment which indicates at the time Plaintiff first was employed, the company was Florida Power Corporation."  Plaintiff's attachment 8, doc. 62-1, p. 28.  The history of the company and the name change to Progress Energy is irrelevant in this case against the Union.

[5]  That Exhibit A is found on the electronic docket as doc. 51-3, pp. 31-54.  The relevant language as quoted ahead is doc. 51-3, p. 43.

¶ 8; Exhibit A, p. 23. He returned to work on February 5, 1997. Doc. 51-2, p. 2, Enyard affidavit, ¶ 8.

After resuming employment, Plaintiff continued to file grievances on a number of matters. Doc. 51-2, pp. 2-3; Enyard affidavit, ¶ 9. As was the case with his first term of employment, some of Plaintiff's grievances were successful, some were not, and some were again "discontinued by the Union." Doc. 51-2, p. 3; Enyard affidavit, ¶¶ 9-10. Again, Plaintiff never asserted during this time period that the Union treated him unfairly or failed to fairly represent him. Doc. 51-2, p. 3; Enyard affidavit, ¶ 10.

In August of 2003, Plaintiff "was accused of abusing/threatening one" of Progress Energy's customers. Doc. 51-2, p. 3; Enyard affidavit, ¶ 11. During the investigation of that grievance, Plaintiff responded by stating "he was not on company time and that he did not threaten the customer." Doc. 51-2, p. 3; Enyard affidavit, ¶ 11. Both of Plaintiff's assertions were found to be untrue as Plaintiff could not support his version of the events,[6] and Plaintiff was suspended for one day without pay. Doc. 51-2, p. 3; Enyard affidavit, ¶¶ 11-12. After this matter was terminated, Plaintiff threatened the Union with litigation if the grievance was not resolved to his satisfaction. Doc. 51-2, pp. 3-4; Enyard affidavit, ¶ 14. The Union stood by its decision. Doc. 51-2, p. 4; Enyard affidavit, ¶ 14.

In April of 2004, anonymous employees of the Odena Line Crew sent a letter to the Union complaining of safety violations by Plaintiff, who worked on that crew. Doc.

---

[6] For example, Plaintiff asserted he was not on company time, but the investigation revealed the "incident took place at 4:45 p.m. on the day in question, and [Plaintiff] clocked out at 5:30 p.m." Doc. 51-2, p. 3; Enyard affidavit, ¶ 13.

51-2, p. 4; Adams affidavit, ¶ 2.[7]  Shortly after receipt of the letter, Progress Energy decided to assess skills of all linemen in the crew, and created a process to make that assessment.  *Id.*  The process involved having multiple supervisors observe linemen in the field and provide an "objective assessment of line personnel skills and development needs to ensure employees are qualified to safely, efficiently and productively perform work within their classification."  Doc. 51-2, p. 4; Adams affidavit, ¶ 3.  Mr. Adams states in his affidavit that the process "appeared to be fair if carried out in the manner stated" by Progress Energy.  Adams affidavit, ¶3.

Mr. Spellicy, a Progress Energy manager, observed the Odena crew for two weeks, noting a number of safety violations by Plaintiff, "several of which could have led to serious injury or death on the part of fellow employees."  Doc. 51-2, p. 4; Adams affidavit, ¶ 5; Exhibit A.[8]  Mr. Holman then observed the Odena linemen for two weeks, also noting a number of safety violations by Plaintiff, including "several of which could have led to serious injury or death on the part of fellow employees.  Doc. 51-2, p. 4; Adams affidavit, ¶ 6.  "In fact, Mr. Holman was so concerned [over Plaintiff's] failure to follow safety procedures that he placed [Plaintiff] on immediate administrative leave <u>with pay</u>."  Doc. 51-2, p. 5; Adams affidavit, ¶ 7; Exhibit B.[9]

---

[7] The affidavit of Joseph Adams, the current Business Manager for Defendant I.B.E.W., is filed on the electronic docket as doc. 51-3.

[8] Exhibit A, attached to the Adams affidavit, filed on the electronic docket as doc. 51-3, p. 10-12, is a memorandum on Progress Energy letter head from Mr. Spellicy to Steve Mandakunis dated May 28, 2004.  The allegations pertaining to Plaintiff's assessment are found on pages 2-3 of the memorandum.  Defendant's Exhibit A.

[9] Exhibits B, on the electronic docket as doc. 51-3, pp. 13-15, is a memorandum from Edward Holman to Steve Mandakunis dated June 12, 2004  The part pertaining to Plaintiff's assessment is on pages 13-14.  Defendant's Exhibit B.

On August 27, 2004, Plaintiff was notified by Mr. Mandakunis that he would receive a five-day suspension for the safety violations as observed by Messrs. Holman and Spellicy.  Doc. 51-2, p. 5; Adams affidavit, ¶ 8; Exhibits C and D.[10]  Mr. Mandakunis had arranged for Plaintiff to "receive an update on his training."  Doc. 51-2, p. 5; Adams affidavit, ¶ 8; Exhibits C and D.  Plaintiff completed the training and returned to work in late October, 2004.  Doc. 51-2, p. 5; Adams affidavit, ¶ 9.  Plaintiff also grieved the five-day suspension.  *Id.*

While Plaintiff was working on St. George Island on January 11, 2005, he caused a loss of power to a residential area.  Doc. 51-2, p. 5; Adams affidavit, ¶ 10.  After review of the events that day, Plaintiff was terminated from his employment on February 15, 2005.  Doc. 51-2, p. 5; Adams affidavit, ¶ 11; Exhibits E and F.[11]  Plaintiff requested a letter from Progress Energy concerning the reason for his termination.  Doc. 51-2, p. 5; Adams affidavit, ¶ 12.  The letter was issued, advising Plaintiff that he "was terminated for, *inter alia,* safety violations occurring on January 11, 2005."  Doc. 51-2, p. 5;[12] Adams affidavit, ¶ 12.

---

[10] Exhibit C is a memorandum from Mr. Mandakunis to Plaintiff, dated August 27, 2004, advising Plaintiff that he was receiving a written reprimand and a five-day suspension without pay.  Doc. 51-3, pp. 16-17.  The memorandum required Plaintiff to complete two weeks of training (September 13-27, 2004) at the Winter Garden Training Center, and stated Plaintiff was "eligible to return to work . . . after successfully completing retraining in the Lineman Updated Training Classes."  *Id.*, at 17.  Exhibit D was the training request submitted by Mr. Mandakunis for Plaintiff.  Doc. 51-3, p. 18.

[11] These exhibits are filed on the electronic docket as docs. 51-3, pp. 19-25.

[12] Throughout the statement of facts section, the years of the events are incorrectly listed.  Doc 51-2, pp. 4-6.  The affidavit by Mr. Adams clarifies the correct dates.  Doc. 51-3.

Plaintiff represented a different version of the events of January 11th, and based on that version, the Union filed a grievance on Plaintiff's behalf on February 15, 2005. Doc. 51-2, p. 5; Adams affidavit, ¶ 11; Exhibit G. While preparing for arbitration concerning Plaintiff's termination, Plaintiff "presented several different versions of what happened on January 11, 2005." Doc. 51-2, p. 5; Adams affidavit, ¶ 13. First, Plaintiff said he never touched the transformer. Doc. 51-2, p. 6; Adams affidavit ¶ 14. Then Plaintiff explained he opened the transformer, but made no changes inside. Doc. 51-2, p. 6; Adams affidavit ¶ 15. The third version was that he made changes, but he asserted they could not have resulted in an outage. Doc. 51-2, p. 6; Adams affidavit ¶ 16. A witness for Progress Energy (who was an African-American apprentice) stated that Plaintiff opened the transformer and switched two connectors, after which a puff of smoke came from the transformer, and the outage occurred. Doc. 51-2, p. 6; Adams affidavit ¶ 17. There were several witnesses to what happened on January 11th, each of whom gave testimony consistent with each other, but inconsistent with Plaintiff's versions of the events. Doc. 51-2, p. 6; Adams affidavit ¶ 19. Despite being advised of the inconsistencies with Plaintiff's statements, Plaintiff insisted that those persons be present at the arbitration hearing. Doc. 51-2, p. 6; Adams affidavit ¶ 20. Ultimately, it was determined that Plaintiff was not a credible witness and the Union concluded it could not call Plaintiff to testify as it "would constitute suborning perjury." Doc. 51-2, p. 6; Adams affidavit ¶ 21. Plaintiff agreed with the decision to not testify on his own behalf. Doc. 51-2, p. 7; Adams affidavit ¶ 22.

The arbitration was scheduled for August, 2006, and just thirty minutes prior to the start of arbitration, Progress Energy presented to the Union exhibits it intended to

introduce, some of which had never been seen before by the Union.  Doc. 51-2, p. 7;

Adams affidavit ¶ 23.  Of particular note was Exhibit 16 stating that Plaintiff had been

placed on administrative leave "pending investigation of unsafe acts and EEO charges

made by employee."  Doc. 51-2, p. 7; Adams affidavit ¶ 23.  Concerned about Plaintiff's

EEO charges, the Union consulted with Plaintiff and then demanded a continuance of

arbitration.  *Id.*  The existence of EEO charges altered the way that the Union would

"prosecute the case in light of a discriminatory motive for the Company's actions."  Doc.

51-2, p. 7; Adams affidavit ¶ 24.  The arbitration was rescheduled for December 5-7,

2006.  *Id.*

    Exhibit 16 had been generated during the period immediately preceding the five-

day suspension which Plaintiff had received, and which the Union had grieved on

Plaintiff's behalf.  Doc. 51-2, p. 7; Adams affidavit ¶ 25.  Prior to receipt of Exhibit 16,

the Union had not intended to include the issue of the five-day suspension in the August

1, 2006, arbitration.  Doc. 51-2, p. 7; Adams affidavit ¶ 25.  The Union changed its

position, however, after reviewing Exhibit 16, although the Union did not consider the

exhibit to be "dispositive" of a discriminatory motive or rising to the level of direct

evidence.  Doc. 51-2, p. 7; Adams affidavit ¶ 26.  Counsel for the Union did, however,

consider the Exhibit to have elevated the matter, at least minimally, to a mixed motive

case which would alter the manner in which the case should be tried.  Doc. 51-2, p. 8;

Adams affidavit ¶ 26.  Exhibit 16, however, also contained a long list of performance

deficiencies by Plaintiff during the period of observation ( May 17, 2004, to June 9,

2004) which were stated as the basis for Plaintiff's being placed on administrative leave.

Doc. 51-1, Defendant's Exhibit A.

With the arbitration rescheduled for December, preparations continued by the Union to represent Plaintiff, but the Union could not resolve the inconsistent statements provided by Plaintiff as to what occurred on January 11, 2005. Doc. 51-2, p. 8; Adams affidavit ¶ 27. The Union's continued efforts to prepare for the arbitration cast even more doubt about the truth of Plaintiff's statements concerning the January 11th event. Doc. 51-2, p. 8; Adams affidavit ¶¶ 27-29. Indeed, it became even clearer that if Plaintiff "had actually done some of [the] things he at times said he did on that day, in particular the manner in which he described some of the switching on the transformer, someone would have been seriously injured or killed." Doc. 51-2, p. 8; Adams affidavit ¶ 29.

The night before the scheduled arbitration, the parties' settlement discussions resulted in Progress Energy offering Plaintiff a $250,000.00 "washout settlement." Doc. 51-2, p. 8; Adams affidavit ¶ 30. Plaintiff was informed of this offer,[13] and counsel for the Union spent considerable amount of time with Plaintiff and his wife explaining the offer, the risks and problems in going through with arbitration, and answering questions. Doc. 51-2, pp. 8-9; Adams affidavit ¶ 31. The opinion of everyone present was that Plaintiff had little chance of prevailing in arbitration for the simple reason that the Company had a legitimate, non-discriminatory reason for Plaintiff's termination. Doc. 51-2, p. 9; Adams affidavit ¶ 31. That reason (the severity of Plaintiff's unsafe acts which imperiled the lives of his co-workers) would obviate a requirement for progressive discipline and outweigh what could be viewed as partial discriminatory animus. *Id.* Thus, even if discrimination *could* have been a motivating factor in his prior five-day

---

[13] The offer was reduced to writing at Plaintiff's insistence of "written proof" that there was a $250,000.00 offer. Adams affidavit, ¶36. Plaintiff provided a copy of the settlement offer as well. Doc. 62-1, Plaintiff's attachment 5.

suspension, a legitimate, non-discriminatory reason existed for Plaintiff's suspension.

*Id.* Counsel for the Union also explained that compensatory damages would be capped at $300,000.00, which made the settlement offer even more attractive. Doc. 51-2, p. 9; Adams affidavit ¶ 32. Union counsel urged Plaintiff to allow them to make a counter offer of $265,000.00, but if that offer was refused by the Company, to accept the original $250,000.00 offer. Doc. 51-2, p. 9; Adams affidavit ¶ 33.

At the end of the evening, Plaintiff appeared to be in agreement, but by the next morning, December 5, 2006, Plaintiff changed his mind and wanted to proceed with arbitration. Doc. 51-2, p. 9; Adams affidavit ¶ 34. Counsel for the Union again tried to persuade Plaintiff to accept the settlement and explaining to him "the problems with allowing him to testify, and the very high probability that we would lose at arbitration." Doc. 51-2, p. 10; Adams affidavit ¶ 34. Plaintiff, however, was not persuaded and rejected the advice of his counsel to accept the settlement offer, demanded that arbitration proceed, and refused to authorize counsel to present a counter offer to Progress Energy. Doc. 51-2, p. 10; Adams affidavit ¶¶ 36-37. Plaintiff also refused the request by his attorneys to sign a letter memorializing the fact that the $250,000.00 settlement offer was made, that he rejected it, and he refused to authorize his counsel to counter with a request for $265,000.00. Doc. 51-2, p. 10; Adams affidavit ¶ 38. Plaintiff wanted to counter the settlement offer with a request for a $500,000.00 tax-free payment, which he was advised by his attorneys that a "fax free settlement" was not possible. Doc. 51-2, p. 10; Adams affidavit ¶ 37.

The Union lawyers representing Plaintiff came to the conclusion that Plaintiff's complete lack of credibility, combined with the believability of the other witnesses who

would testify about the events for which Plaintiff was being disciplined, would result in losing the arbitration. Doc. 51-2, p. 11; Adams affidavit ¶ 41. Plaintiff was then informed that if he did not accept the settlement offer of $250,000.00, the Union would withdraw the grievance. Doc. 51-2, p. 11; Adams affidavit ¶ 42. Plaintiff refused, the parties reconvened, and the arbitration was terminated. Doc. 51-2, p. 11; Adams affidavit ¶¶ 43-44.

Plaintiff submitted a transcript of the arbitration hearing on December 5, 2006. Doc. 62-1; Plaintiff's attachment 6. That transcript reveals that Plaintiff's counsel stated only that due to the need to maintain the confidentiality of Plaintiff's communications, more could not be stated other than to say that counsel and Plaintiff had irreconcilable differences. *Id.*, at 15-16. Counsel then acted on Plaintiff's benefit by requesting that arbitration be canceled and rescheduled at a later date since Plaintiff, at that time, would not have legal counsel to represent him. *Id.*, at 17-18. Plaintiff was questioned by the arbitrator whether it was his desire to postpone the hearing until he could obtain other counsel, and Plaintiff answered, "Yes, sir." *Id.*, at 17-18. The arbitrator then asked the Union's representative was the Union's position would be in the matter, which was answered by stating that the Union would "discontinue the case" or put another way, "withdraw it." *Id.*, at 18. The transcript reveals that Mr. Sapp stated that the offer to withdraw was accepted, and then Mr. Adams, speaking for the Union, added, "On a non-precedent, non-prejudicial basis like we have done many times in the past." *Id.*

The arbitration transcript makes clear that Plaintiff was aware of a settlement offer and he rejected it. Doc. 62-1, pp. 19-20. The offer was then, officially, "withdrawn

and revoked by Progress Energy." *Id.*, at 20. Plaintiff was asked whether he intended to seek other counsel and pursue his grievance, and he answered, "Yes." *Id.*

**Analysis**

The issue here is whether Defendant discriminated against Plaintiff or retaliated against him in the arbitration proceedings on December 5, 2006. Doc. 12, p. 3. Plaintiff contends that arbitration should have proceeded and union counsel should have produced documents showing various untruths in the allegations presented against Plaintiff by the Company, and should have made further contacts on his behalf with the N.L.R.B. and O.S.H.A.. *Id.*, at 4-5.

Title VII provides, in pertinent part, that "[i]t shall be an unlawful employment practice for a labor organization . . . . to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin . . . ." 42 U.S.C.A. § 2000e-2(c). Defendant is a "labor organization" for purposes of Title VII.

Plaintiff's claim for discrimination fails because there is no evidence that the Union took any action, or failed to take any action on Plaintiff's behalf because of Plaintiff's race or color. Plaintiff has not come forward with any evidence to support his claim that he was denied any privilege, opportunity, or representation given to white or other non-African American members of the union. Plaintiff has provided no evidence of any other similarly situated members (with Plaintiff's history of progressive employment discipline) who were treated more favorably. Plaintiff has not shown disparate treatment, and summary judgment should be granted in favor of the Defendant on this claim.

Plaintiff's claim of retaliation by the Defendant also fails.  Plaintiff has not shown that Defendant refused or failed to present him because of Plaintiff's litigation or filing of discrimination charges against Plaintiff's employer.  Because there is no evidence of retaliation by the Union, summary judgment should be granted in Defendant's favor.

The final claim is that Defendant violated its statutory duty of fair representation to Plaintiff in refusing to continue with arbitration.  "A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith."  Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) (concluding "that a union does not breach its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled the grievance short of arbitration.").  Review of the actions of a labor union is "highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities."  Air Line Pilots Ass'n, Int'l. v. O'Neill, 499 U.S. 65, 78, 111 S.Ct. 1127, 1135, 113 L.Ed.2d 51 (1991).  A court is not at liberty to substitute its judgement for that of the labor union in the bargain reached.  Air Line Pilots, 499 U.S. at 78, 111 S.Ct. at 1135.  Moreover, there is a strong policy in favor of peaceful settlement of labor disputes.  Id., citing Groves v. Ring Screw Works, Ferndale Fastener Div., 498 U.S. 168, 174, 111 S.Ct. 498, 502, 112 L.Ed.2d 508 (1990).

In Vaca v. Sipes, the Supreme Court held that "as statutory agent of the employees, a union must, in good faith and in a nonarbitrary manner, make decisions as to the merits of particular grievances."  386 U.S. at 194, 87 S.Ct. at 918- 19.  Thus, to avoid summary judgment, Plaintiff must show a genuine dispute of material fact and

demonstrate the Defendant was acting either in bad faith or its decision was arbitrary.[14]

"A union's actions are arbitrary only if, in light of the factual and legal landscape at the

time of the union's actions, the union's behavior is so far outside a 'wide range of

reasonableness' as to be irrational." Air Line Pilots, 499 U.S. at 67, 111 S.Ct. 1127.

While a union has a duty to represent its members and cannot arbitrarily refuse to

process a meritorious grievance, it is not required to "pursue a matter merely because

an employee wishes it to do so." McCollum v. Bolger, 794 F.2d 602, 612 (11th Cir.

1986) (holding that union's determination that employee's grievance is without merit and

will not be pursued is not a breach of the duty of fair representation); Stanley v. General

Foods Corp., 508 F.2d 274, 275 (5th Cir. 1975) (holding that the "union met their

obligation of fair representation by pursuing [the employee's] grievance to a point where

further action would have been fruitless").  A union is simply not under an "absolute duty

to pursue a grievance through arbitration" and it does not breach its duty by failing to

continue arbitration which is demanded by the employee.  Stanley, 508 F.2d at 275.

        In this case, the Union represented Plaintiff in arbitration and obtained an offer of

$250,000 to settle.  That settlement would not have restored Plaintiff's employment, but

would have provided monetary relief.  The evidence is undisputed that Plaintiff

committed a number of serious safety violations, putting himself and other employees at

grave risk of injury or even death.  The safety violations were of such a serious nature

that the company supervisor immediately removed Plaintiff from work.  The Union

investigated Plaintiff's grievance against the employer.  This investigation revealed that

---

        [14] As noted above, it has already been established that the Defendant did not act
in a discriminatory fashion.

there was a reasonable basis to terminate Plaintiff's employment in light of the

continued discipline against Plaintiff, and that Plaintiff's testimony was not credible.  The

undisputed evidence is that the Union determined that Plaintiff  would not be successful

in arbitration.  Yet Plaintiff rejected the $250,000 settlement offer.  Plaintiff has not come

forward with any evidence that should have been discovered in favor of Plaintiff's claims

in arbitration.  There is no evidence suggesting that evidence existed and should have

been known to the Union, which could have made any difference to the arbitration

proceedings.  It was not a breach of the duty of fair representation to withdraw, given

these undisputed facts.

**Costs and attorney's fees**

In view of the undisputed evidence discussed above, an award of attorney's fees

and costs in favor of Defendant may be appropriate.  <u>Christianburg Garment Co. v.</u>

<u>EEOC</u>, 434 U.S. 412, 422, 98 S.Ct. 694, 701, 54 L.Ed.2d 648 (1978).  Further, if such a

fee award is appropriate, the court should also consider whether to bar Plaintiff from

proceeding *in forma pauperis* in future cases, and perhaps until he pays the costs of this

suit, in light of his pro se litigation history in this court, including case numbers:

4:08cv574-RH/WCS; 4:94cv148-MP; 4:97cv339-RH; 4:07cv347-SPM/WCS; 4:07cv357-

RH/WCS; 4:09cv116-SPM/WCS; 4:09cv433-RH/WCS; and 4:92cv402-MP.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Defendant's motion for summary judgment, doc. 51, be **GRANTED,** judgment entered in favor of the Defendant on all claims, and that Plaintiff be **ORDERED** to **SHOW CAUSE** why judgment should not be entered against him for Defendant's costs and expenses, including attorney's fees, and the case be **REMANDED** to consider the remaining issues identified above.

**IN CHAMBERS** at Tallahassee, Florida, on October 20, 2010.


s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**